IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KRAUS INDUSTRIES, INC., ) | |
| d/b/a OLSON INDUSTRIES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 04-1788 |
| ) | Judge Terrence F. McVerry |
| COLONY INSURANCE COMPANY ) | Magistrate Judge Lisa Pupo Lenihan |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

**I. RECOMMENDATION**

It is respectfully recommended that the Defendant's Motion for Summary Judgment be denied and that the Court, *sua sponte*, grant summary judgment to Plaintiff as to that portion of its action seeking a declaratory judgment requiring Colony to defend Kraus in the Cross litigation, as more fully set forth below.

**II. REPORT**

This case involves claims related to Defendant's refusal to defend, compensate or indemnify Plaintiff, Kraus Industries, Inc. ("Kraus"), an industrial furnace manufacturer, for liability arising out of an underlying action against Kraus and other parties by the Estate of Walter Cross ("Cross"). Kraus sought coverage from Defendant, Colony Insurance Company ("Colony") in accordance with the terms of its commercial general liability insurance policy ("the Policy").

Because, under applicable Pennsylvania case law, Colony's right to deny coverage is, at best, ambiguous, Defendant's Motion for Summary Judgment should be denied. Moreover, because Colony is obligated to defend its insured where the underlying action "alleges a cause of action which may fall within the coverage of the policy",[1] this Court should *sua sponte* grant summary judgment for Kraus as to that portion of its action seeking a declaratory judgment requiring Colony to defend Kraus in the underlying action. As to the remainder of Plaintiff's action, seeking declaratory judgment as to its entitlement to compensation and indemnification (Count I), as well as damages for Defendant's bad faith in its denial of defense, compensation and indemnification (Count II), the Court should conclude that resolution of those issues would be premature at this time.[2]

### A. Statement of Facts and Procedural History

Kraus has been named as one of many defendants in a case brought in Trumbull, County, Ohio by the Cross Estate (the "underlying action"). That Complaint alleges that Kraus or its predecessor supplied Cross' employer, Copperweld Steel, with asbestos-containing products and that Cross contracted the mesothelioma from which he died because of his employment-related

---

1. Union America Ins. Co., Ltd. v. JB Johnson, 803 A.2d 431, 433 (Pa. Super. 2002); id. (noting that all doubts as to whether the claims may fall within the policy are to be resolved in favor of the insured).

2. Liability under the Pennsylvania bad faith statute requires a showing that the insurer lacked a reasonable basis for denying benefits and knew or recklessly disregarded its lack of reasonable basis. See Klinger v. State Farm Mut. Auto Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997) (cited in Defendant's Brief in Support of Motion to Dismiss at 13). In addition, the duty to indemnify originates from the facts as they are determined at the underlying trial; thus an insurer obligated to defend a suit may ultimately be relieved of its duty to indemnify. See Hefferman & Co. v. Hartford Ins. Co., 614 A.2d 295 (Pa. Super. 1992).

exposure to asbestos.[3] Although the Complaint is non-specific, asserting only exposure to asbestos-containing products, Kraus avers that the only asbestos contained in products it provided to Cross' employer was solid, hard-block or transite-board form asbestos situated within several furnaces sold to Copperweld between 1958 and 1971.[4]

Kraus requested that Colony provide insurance coverage with regard to the underlying action, in accordance with the terms of a general liability policy in effect since February, 1997. That policy insures Kraus against liability for bodily injury (defined as including "sickness or disease") from an occurrence (defined as including "an accident, including continuous or repeated exposure to substantially the same general harmful conditions") in the coverage territory and during the policy period. See Complaint for Declaratory Judgment and Breach of Contract ("Complaint") at ¶¶ 3-5. An endorsement to the Policy disclaims coverage for injury "which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'hazardous materials' at any time." See id. at ¶ 9. This endorsement defines "hazardous materials" as including asbestos.[5]

In response to Kraus' request, Colony, by letter of September 29, 2004, denied coverage because the occurrence was outside the Policy dates. As noted in responsive correspondence by

---

3. Cross was first diagnosed with mesothelioma no earlier than 1998 and died in 2002. See Complaint for Declaratory Judgment and Breach of Contract at ¶ 6. He had retired from the Copperweld Steel Plant in 1986. See Plaintiff's Responsive Concise Statement of Material Facts ("Plaintiff's SMF"), Exhibit B. See also Defendant's Motion for Summary Judgment at 6 ("'the only known cause of mesothelioma is exposure to, and inhalation of, asbestos dust and fibers'") (quoting Blancha v. Keene Corp., 1991 U.S. Dist. LEXIS 15394, *8 (E.D. Pa. 1991)).

4. See id. at ¶ 17; Affidavit attached as Exhibit C.

5. The exclusion at issue here is commonly referred to as a "pollution exclusion".

Plaintiff's counsel, the Policy requires, however, only that the *bodily injury*, and not the occurrence, take place during the Policy period.[6]  Defendant appears to have conceded this point and, by letter of October 21, 2004, Colony instead denied coverage under the Policy's "Hazardous Materials", or pollution, exclusion.[7]

### B. Motion for Summary Judgment; Burden of Proof

Summary judgment is to be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

All doubts as to the existence of a genuine issue of material fact are resolved against the moving party, and the entire record is examined in the light most favorable to the nonmoving party. Continental Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982).

Under governing Pennsylvania law, the interpretation of an exclusion in an insurance policy is a question of law for the court. Curbee, Ltd. v. Rhubart, 594 A.2d 733, 735 (1991). Where an insurer bases its denial of coverage on a policy exclusion, it bears the burden of proving the exclusion's applicability. See, *e.g.*, Erie Ins. Exchange v. Transamerica Insur. Co., 533 A.2d 1363, 1366 (Pa. 1987). Thus, unless the insurer establishes that the allegations of the

---

6. See Plaintiff's SMF at ¶ 15.

7. See Defendant's Brief in Support of Motion for Summary Judgment, Exhibit E (Letter of October 21, 2004 from Defendant to Plaintiff, asserting that, because of the endorsement, "the Colony policy does not apply to bodily injury related to the exposure of asbestos"). See also Defendant's Motion for Summary Judgment at ¶ 21 (stating that its initial correspondence "inadvertently failed" to state that coverage was being denied under the hazardous materials exclusion).

underlying complaint fall within the stated scope of the exclusion, the court must require the insurer to tender a defense under the policy.  See Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999); Britamco Underwriters, Inc. v. Weiner, 636 A.2d 649, 651 (Pa. Super. 1994).

 C. Analysis

  **1. History and Interpretation of Coverage under General Liability Policy's Pollution Exclusion Clause**

 Pollution exclusion clauses first began to appear in comprehensive general liability policies in the 1970s, and were intended to do as their name implies, *i.e.*, exempt "pollution" from the comprehensive liability coverage otherwise provided by such policy.  More specifically, the clauses were intended to exempt the insurance providers from liability in traditional large-scale environmental pollution actions, such as government-ordered and/or private-party clean-up actions (*e.g.*, CERCLA).[8]  Since that time, the language of the pollution exclusion has continued

---

8.  See Morton Int'l, Inc. v. General Accident Ins. Co., 629 A.2d 831, 850 (N.J. 1993) (observing that the insurance industry, concerned about an impending crisis in claims for environmental-pollution catastrophes, began "drafting and securing regulatory approval for" a standard pollution exclusion clause in 1970).  The exclusion was initially intended to remove the "moral hazard" of insurance against environmental pollution by limiting coverage to accidental occurrences.  Id.  Accordingly, the language of the original standard pollution exclusion clause provided that coverage would not apply to "injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water" unless the occurrence was "sudden and accidental."  Id.  The phrase "sudden and accidental" was removed in 1986, thus excluding coverage for all damage caused by pollution discharge.

 See generally Jeffrey W. Stempel, Reason and Pollution: Correctly Construing the "Absolute" Exclusion in Context and in Accord with its Purpose and Party Expectations, 34 Tort & Ins. L.J. 1, 5 (1998); John N. Ellison, et al., Recent Developments in the Law, ALI-ABA Course of Study Materials, Environment Insurance (June 16, 2005) (hereinafter "Recent Developments").

5

to evolve, as the industry has repeatedly responded to court holdings limiting the exclusion's applicability to its unambiguous meaning. For example, the term "pollutants" has become "hazardous materials", "seepage" and "migration" have been added to the descriptive terms, and references to movement of the hazardous material into the "environment" or "atmosphere" have been removed.[9]

In addition to referencing the pollution exclusion's *raison d'etre*, courts considering its applicability to particular circumstances also frequently note the relevant rules of construction. Most insurance contracts are contracts of adhesion, reflecting industry-wide consultation and agreement, as well as drafting by industry-wide committees, that in other industries would constitute anti-trust violations.[10] Accordingly, the courts interpret these policies under rules

---

9. See Center for Creative Studies v. Aetna Life and Cas. Co., 871 F.Supp. 941, 943 (E.D. Mich. 1994) (noting that "one of the most hotly litigated insurance coverage questions of the late 1980's and early 1990's has been the scope and application of the pollution exclusion contained in the standard commercial general liability (CGL) policy") (citation omitted) (quoted in Madison Construction Co. v. Harleysville Mutual Ins. Co., 735 A.2d 100, 106 (Pa. 1999)); Porterfield v. Audobon Indemnity Co., 856 So.2d 789, 800 (Ala. 2003) ("Rarely has any issue spawned as many . . . court decisions as has the pollution-exclusion clause.").

A court's determination of the scope of a pollution exclusion clause frequently must address both (a) whether the substance at issue constituted a "pollutant" or "hazardous material", and (b) whether the manner of transmission\contamination falls within the exclusionary language. However, because Defendant's policy encompasses asbestos by definition (see *supra* p. 3), this Court need only concern itself with whether, in this case, the manner of movement falls unambiguously within the exclusionary language.

10. Cf. Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303, 1311 (3d Cir. 1994) (recognizing that, under Pennsylvania case law, the emerging theme of insurance contract interpretation was that the "courts [should] be chary about allowing insurance companies to abuse their position vis-a-vis their customers").

frequently favoring the policyholder.[11] Perhaps the most important of the canons of construction is *contra proferentem*, which requires that when a term of an insurance policy is susceptible to more than one reasonable interpretation, it must be construed against the insurance company that drafted it and in favor of coverage.[12]

### 2. Application of Madison, Lititz and Mistick

The parties do not cite, and this Court has not discovered, any Pennsylvania case addressing the question of applicability of a standard form pollution exclusion clause to asbestos. Nor has the Court, despite exhaustive research, discovered a helpful case in any jurisdiction

---

11. See, *e.g.*, Collister v. Nationwide Life Ins. Co., 338 A.2d 1346, 1350 (Pa. 1978) (recognizing that "the conditions of an insurance contract are for the most part dictated by the insurance companies" and such contracts "are not freely negotiated instruments entered into by parties of equal statuts").

12. See generally Defendant's Brief in Support of Motion for Summary Judgment at 5 (noting that "contractual terms are ambiguous if they are subject to more than one reasonable interpretation") (citing Pennsylvania cases); id. at 4 (noting that ambiguous provisions are "to be construed in favor of the insured and against . . . the drafter of the agreement"). Cf. Lucker Mfg. v. Hone Ins. Co., 23 F.3d 808, 814 (3d Cir. 1994) (noting that the language of a policy "must be tested by what a reasonable person in the position of the insured would have understood the words to mean").

As a further aid to interpretation, the Commonwealth's Courts note that a party's intent and understanding of its contract terms is generally informed by the theretofore-recognized purposes of the contractual language. Cf. Sunbeam Corp. v. Liberty Mut. Ins. Co., 781 A.2d 1189 (Pa. 2001) (holding that, where terms of policy possess specialized meaning in insurance industry through custom and usage, presumption is that parties contracted with reference to it); id. at 1193 (concluding that "custom in the industry . . . is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract); Lititz Mutual Insur. Co. v. Steeley, 785 A.2d 975, 982, n. 12 (Pa. 2001) (noting that effect of Sunbeam holding on Lititz, if any, would be "to enhance [insured]'s position"). Cf. 785 A.2d at 982, n. 11 (observing that it is the "drafters of the policy who are in the best position to introduce greater clarity into the process, as, for example, by including in their policies an explicit exclusion").

7

addressing the question of applicability of a pollution exclusion clause to asbestos where, as here, injury in the underlying action is alleged to arise from the presence and gradual deterioration of asbestos, rather than exposure to employees or other individuals as a result of work purposefully abrading/disturbing asbestos-containing materials (and thereby releasing dust and fibers into the air).[13] The language of existing Pennsylvania law on the interpretation and parameters of a pollution exclusion clause, however, suggests that the Commonwealth's Courts would hold Defendant's exclusion inapplicable under the circumstances of this case.

Defendant would have this Court conclude that the applicability of its hazardous materials exclusion to this case should be governed by the Pennsylvania Supreme Court's decision in Madison Construction Co. v. Harleysville Mutual Insurance Co., 735 A.2d 100 (Pa. 1999). In Madison, the Pennsylvania Supreme Court determined that an insurer's pollution exclusion clause applied to injuries sustained by a worker who fainted and fell after being overcome by fumes from a concrete sealer which had just been applied in an enclosed area.[14]

---

13. Although this Court has found several cases rejecting a pollution exclusion where injury related to the presence of asbestos, such cases have relied upon earlier versions of and/or differing interpretations of the exclusionary language. For example, although many other courts have held applicability of a general liability policy's pollution exclusion is limited to environmental pollution, and have found a duty to defend in asbestos-injury cases on those grounds, Pennsylvania has declined to adopt a strictly environmental reading of the clause. See Madison, 735 A.2d at 108 (rejecting argument that words at issue were terms of art in environmental law, thus requiring dispersal into the broad, natural environment, *i.e.*, outside the work environs or area of intended use). But see Madison, 735 A.2d at 111 (Cappy, J., dissenting) ("[W]e agree with those courts which have restricted the exclusion's otherwise potentially limitless application to only those hazards traditionally associated with environmental pollution.") (citing American States Ins. Co. v. Koloms, 687 N.E.2d 72, 79 (1997)).

14. More specifically, the employee was attempting to set up an exhaust fan for fumes emanating from a chemical compound being used to cure newly-poured concrete. The construction area had been sealed off in an "envelope" of polyethylene sheeting. The employee
(continued...)

Although the central issue in this case was whether the compound was a "pollutant" under the policy, a question not before this Court, in reaching its holding, the Pennsylvania Supreme Court observed that the language of the exclusion was intended "to comprehend all such types and degrees of movement." Madison, 735 A.2d at 609.[15]  From this, Defendant asserts it necessarily follows that the hazardous materials exclusion applies to the instant case, in which asbestos moved into the air breathed by Cross.

Plaintiff, however, asserts that its action is more appropriately governed by the Pennsylvania Supreme Court's subsequent decision in Lititz Mutual Insur. Co. v. Steeley, 785 A.2d 975 (Pa. 2001), as well as the Superior Court's decision (on remand from the Supreme Court following Lititz) in Mistick, Inc. v. Northwestern National Casualty Co., 806 A.2d 39 (Pa. Super. 2002).  Most significantly, these cases involved not a discrete discharge or release of toxic fumes, but a "continual, imperceptible, and inevitable deterioration" of a solid-substance, *i.e.*, lead paint.  Lititz, 785 A.2d at 982.[16]  In both cases, the Pennsylvania Courts held that the terms

---

14. (...continued)
entered the enclosed area and succumbed to the fumes.  See Madison, 735 A.2d at 102.  As the Supreme Court noted, the sheeting was in place as a containment measure, because the curing agent was fully expected to disperse into the air upon application.  See id. at 108.  The Court rejected the trial court's conclusion that the exclusion would apply only if there had been a discharge or dispersal of the vapors beyond the contained area into the general "environment" or "atmosphere".  See id. at 108.

15. Cf. Danbury Ins. Co. v. Novella, 727 A.2d 279, 282 (Conn.Supp. 1998) (noting that "such terms limit the ways by which the pollutant must travel from a contained place to the injured person's surroundings and then cause injury'") (quoted with approval in Lititz Mutual Insur. Co. v. Steeley, 785 A.2d 975, 981 (Pa. 2001)).

16. Lititz and Mistick both involved underlying actions by tenants against their landlords for lead poisoning as a result of exposure to lead paint used in the premises.  When lead paint deteriorates over time, the gradual surface degradation causes small fragments and microscopic

(continued...)

"discharge, dispersal, release or escape" in a pollution exclusion clause did not unambiguously exclude coverage for bodily injured alleged to have resulted from exposure to gradually deteriorating paint. In Mistick, the language held inapplicable included "seepage and migration" as well.[17]

      This Court must, therefore, concur with Plaintiff. In this case, the long-term, gradual deterioration of the solid-form asbestos that may have been inside the commercial furnaces sold by Plaintiff to Copperweld is more analogous to the deterioration of lead paint described in Lititz

---

16. (...continued)
particles of the paint to become available for ingestion or inhalation. See Lititz, 785 A.2d at 977.

17. See Mistick, 806 A.2d at 44. In Mistick, the Superior Court expressly premised its holding on the Supreme Court's explication of pollution exclusion clause language in Madison. It concluded that the Pennsylvania Supreme Court's previous definition of "seepage" "contemplate[d] the movement of fluid substances." Id. It further held that "migration" was, like "dispersal", a term "that our Supreme Court discounted in Lititz, . . . a vague and general term inconsistent with the other terms used in the exclusion, *i.e.*, discharge, release, seepage and escape." Id. (concluding that the "exclusionary language [therefore did] not clearly include or exclude the physical process . . . at issue, but [was] . . . ambiguous"). Cf. Andersen v. Highland House Co., 757 N.E.2d 329, 333 (2001) ("It is not the responsibility of the insured to guess whether certain occurrences will or will not be covered based on nonspecific and generic words or phrases that could be construed in a variety of ways. Thus, in order to defeat coverage, the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such interpretation is the only one that can be fairly placed on the language in question.").

    See also Madison, 735 A.2d at 108 (citing dictionary definitions of the pollution exclusion terms suggesting either a specific-occurrence (*i.e.*, an act or instance) or flow-related understanding of each of the terms, with the sole exception of "migration", defined very broadly as movement from place to place); Lititz, 785 A.2d at 981 (explaining that the terms "discharge, dispersal, release or escape" in the absolute pollution exclusion of a commercial general liability insurance policy ordinarily imply "an active or clearly perceived physical event and thus do not apply to the imperceptible flaking of lead paint, which is attributable to an involuntary process that occurs over a considerable period of time") (quoting Byrd v. Blumenreich, 722 A.2d 598, 602 (N.J.Super. 1999)). Cf. Lumbermens Mut. Cas. Co. v. S-W Industries, 39 F.3d 1324, 1336 (6th Cir. 1994) (citing similar dictionary definitions in discussion of plain meaning of terms).

and Mistick, which cases were unduly omitted from Defendant's Brief in Support of its Motion for Summary Judgment. The transmission of any small or microscopic particles of asbestos from the furnaces owing to surface deterioration is comparable to the gradual degradation and resultant movement of lead paint particles. See Lititz, 785 A.2d at 981 (describing how lead paint exfoliates, chips, chalks, flakes "or otherwise breaks down into dust" continuously over time).

Moreover, these cases clearly reflect that, in assessing coverage for injury owing to exposure, Pennsylvania looks to the *manner* of the substance's movement. See Mistick, 785 A.2d at 981 (noting that "in determining whether there has been a discharge, dispersal, release or escape [of a hazardous material], it is necessary to assess the specific form of movement in question"); Lititz, 785 A.2d at 981 (same); id. (concluding that, because "the process of surface degradation" by which lead paint becomes available for ingestion or inhalation "occurs continually, but at a slow rate", this type of movement did not unambiguously fall within the terms "discharge, dispersal, release or escape"). See also *supra* n. 17.[18]

---

18. Many other courts make similar distinctions. Compare, *e.g.*, U.S. Liab. Ins. Co. v. Bourbeau, 49 F.3d 786, 788 (1st Cir. 1995) (concluding that pollution exclusion unambiguously covered lead paint that was *scrapped* from a building) with Atlantic Mut. Ins. Co. v. McFadden, 595 N.E.2d 762 (Mass. 1992) (holding that pollution exclusion did not bar coverage for injury resulting from *presence* of lead paint). See also Sphere Drake Ins. Co. v. Y.L. Realty Co., 990 F.Supp. 240, 243 (S.D.N.Y. 1997) (observing that, in accepted usage, the terms "discharge, dispersal, release or escape" do not encompass the type of "movement" associated with lead paint poisoning) (cited with approval in Lititz, 785 A.2d at 981); Rubin v. St. Paul Fire & Marine Ins. Co., 3 Mass. L. Rptr. 680 (Mass.Super.Ct. 1995) (discussing distinction between Bourbeau and McFadden); Estate of Mini v. Metro Supply & Serv., Inc., 2004 WL 1284173 (N.J. Super. App. Div. June 8, 2004) (following Byrd where complaint did not "allege an active or physical event" within the terms of the pollution exclusion, but only "a non-specific 'exposure'").

The language of at least two other courts' decisions highlights the importance of a specific occurrence or active event in asbestos cases as well. See Cincinnati Ins. Co. v. German St. Vincent Orphan Ass'n, Inc., 54 S.W.3d 661, 666 (Mo. Ct. App. 2001) (noting that where asbestos
(continued...)

Thus, Colony's protestations to the contrary notwithstanding, Cross' exposure is not itself sufficient to bring this case within its Policy exclusion.[19]  Defendant's Reply Brief at 5.  Rather, application of the pollution exclusion language turns on whether the particular circumstances fall within the exclusion's unambiguous terms.  And the Pennsylvania Courts have clearly held that the transmission of a hazardous solid-substance paint through a continual, imperceptible, inevitable deterioration does not.[20]  This Court, having thoroughly considered the exclusion's history and  rules of construction, and related cases in the Commonwealth and elsewhere, sees no reason to believe the Commonwealth would reach a different conclusion in this case.

III. CONCLUSION

Because the language of Colony's hazardous materials exclusion does not unambiguously relieve Colony of its obligation to defend, indemnify and compensate Kraus with regard to the underlying personal injury action, it is recommended that the Motion for Summary Judgment be

---

18.  (...continued)
fibers were released during machine removal of old vinyl flooring, such removal constituted a "release or discharge . . . as set forth in the exclusion"); Selm v. American States Ins. Co., 2001 WL 1103509 (Ohio Ct. App. Sept. 21, 2001) (holding that "activities in removing" vinyl kitchen flooring resulted in "release" of asbestos-containing materials) (citing German St. Vincent).

19.   See Defendant's Reply Brief at 3, 6 (asserting that because Cross inhaled asbestos dust and fibers, there must have been "movement of the fibers . . . into the air" and any assertion that the case is outside the exclusion language is therefore "simply without merit" or "disingenuous"). Compare id. (acknowledging that in both Lititz and Mistick - cases held to fall outside similar or identical verbiage - "movement of some sort [w]as the originating cause").

20.  See Lititz, *supra*; Mistick, *supra*.  As the Pennsylvania Supreme Court has observed, the majority of jurisdictions deciding the issue have concluded that a pollution exclusion clause does not exclude coverage for lead paint claims.  See Lititz, 783 A.2d at 908, n. 8 (citations omitted); Danbury Ins. Co. v. Novella, 727 A.2d 279, 282 (Conn.Supp. 1998) (recognizing "overwhelming trend" in favor of coverage).

denied. In addition, it is recommended that this Court *sua sponte* grant summary judgment to Plaintiff as to that portion of its action seeking a declaratory judgment requiring Colony to defend Kraus in the Cross litigation.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

      /s/ Lisa Pupo Lenihan
LISA PUPO LENIHAN
United States Magistrate Judge

Dated: October 18, 2005

cc:    The Honorable Terrence F. McVerry
       United States District Judge

       Michael J. McShea, Esq.
       Malone Middleman, P.C.
       Northridge Office Plaza
       117 VIP Drive, Suite 310
       Wexford, PA  15090
       Counsel for Plaintiff

       Theodore M. Schaer, Esq.
       Zarwin, Baum, DeVito,Kaplan,
       Schaer & Toddy, P.C.
       1515 Market St., Suite 1200
       Philadelphia, PA  19102
       Counsel for Defendant

14